IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| MATTHEW J. BEADERSTADT,<br><br>Plaintiff,<br><br>vs.<br><br>HANSON DIRECTORY SERVICE, INC., and WILLIAM HANSON, individually and in his corporate capacity,<br><br>Defendants. | CASE NO.  4:13-cv-442<br><br><br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Matthew J. Beaderstadt states for his Petition and Jury Demand against Defendants Hanson Directory Service, Inc ("Hanson Directory") and William Hanson ("Hanson") as follows:

## INTRODUCTION

1.   This action is brought to redress Plaintiff's rights under the Americans with Disabilities Act ("ADA"), as amended by the Americans with Disabilities Act Amendments Act ("ADAAA") (both the ADA and the ADAAA shall be hereinafter referred to collectively as the "ADAAA") (42 U.S.C. §12101 *et seq.*), and the Iowa Civil Rights Act, Iowa Code § 216.

2. This is also an action against Hanson Directory and Hanson for wrongfully terminating Plaintiff in violation of the public policy of the state of Iowa after Plaintiff stated his intent to provide sworn testimony unfavorable to Defendants.

## JURISDICTION AND VENUE

3. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. §12101 *et seq*.

4. This Court has supplemental jurisdiction over Plaintiff's claims under the Iowa Civil Rights Act, Iowa Code § 216, and Plaintiff's wrongful termination claims, pursuant to 28 U.S.C. § 1367

5. The unlawful employment practices described herein were committed within the State of Iowa in Jasper County. This Court is, therefore, a proper venue for this action pursuant to 28 U.S.C. § 1391(b).

## PARTIES

6. Plaintiff is a citizen of the city of Newton, Jasper County, Iowa.

7. Hanson Directory is incorporated in the State of Iowa with its principal place of business in Newton, Jasper County, Iowa.

8. Hanson Directory is a covered entity as defined by the ADAAA, 42 U.S.C. § 12111(2) and 42 U.S.C. § 12111(5).

9. Upon information and belief, Hanson is a citizen of the city of Johnston, Polk County, Iowa.

10. Plaintiff was at all material times employed by Hanson Directory at its Newton, Iowa location.

## FACTUAL ALLEGATIONS

Plaintiff's Employment with Hanson Directory

11. Plaintiff began working for Hanson Directory as an Account Consultant on or about September 13, 1993.

12. Plaintiff was promoted to Sales Manager and for the last 10 or 11 years of his employment Plaintiff was the Vice President of Sales for Hanson Directory.

13. Plaintiff's job duties as Vice President of Sales included sales, marketing, distribution, supervising approximately forty to fifty employees who reported directly or indirectly to Plaintiff, hiring, firing, sales forecasting, and general oversight of day-to-day operations.

14. In addition to providing Plaintiff with a salary, Hanson Directory provided with Plaintiff with car insurance, the use of a company vehicle, a cell phone, a lap top, and disability and life insurance as employment benefits.

15. As Vice President of Sales, Plaintiff reported directly to Defendant Hanson.

Plaintiff's Car Accident and Resulting Injuries

16. On July 10, 2011, Plaintiff was involved in a traumatic car accident in Jasper County.

17. Plaintiff was picking up his daughter when his car was struck by another car. The accident was the other driver's fault.

18. Plaintiff was life-flighted from the scene of the accident to Mercy Hospital in Des Moines, Iowa. He suffered a fractured pelvis, 7 broken ribs, a torn diaphragm, a crushed lung, and a nicked spleen.

19. The car accident and resulting injuries required Plaintiff's hospitalization in the Intensive Care Unit. He was on a ventilator for eight or nine days following the accident. All total, Plaintiff was in the hospital for approximately one month and underwent extensive physical therapy following his discharge from the hospital.

20. Because of the injuries he suffered, Plaintiff took a medical leave of absence from his job at Hanson Directory from July 12, 2011 until September 20, 2011.

Plaintiff's Attempts to Return to Work

21. Plaintiff felt ready to resume his job duties and reported back to work at Hanson Directory on or about September 20, 2011.

22. On September 27, 2011, however, Hanson sent Plaintiff home. He told Plaintiff that Plaintiff needed to extend his medical leave of absence and that Plaintiff would not be attending an upcoming work-related conference in Chicago.

23. When Plaintiff asked why he had to extend his medical leave and why he could not attend the upcoming work-related conference in Chicago, Hanson said that Plaintiff had "changed."

24. Plaintiff then asked Hanson what he meant by "changed," and Hanson replied that he thought Plaintiff needed cognitive therapy due to memory lapses and mood swings.

25. When Plaintiff probed further and asked for specific examples of the alleged memory lapses and mood swings, Hanson did not provide any.

26. During the September 27, 2011 conversation, Hanson also told Plaintiff that Plaintiff could not come back to work until he had a release from his orthopedic physician.

27. Plaintiff offered to instead get an immediate release from his family physician, Laurie Siddall. Hanson responded that Plaintiff could get an immediate release from Siddall if he wanted to be "cute and clever."

28. Having no idea what Hanson was talking about with regard to being "cute and clever," Plaintiff went home and extended his medical leave of absence, as instructed.

<u>Hanson's Continued Refusal to Return Plaintiff to Work</u>

29. On or about October 4, 2011, Plaintiff had a follow-up appointment with Siddall and went to Hanson Directory's office to update Hanson on his health status.

30. During Plaintiff's discussion with Hanson on October 4, 2011, Hanson for the first time told Plaintiff that Plaintiff had to have a neuropsychological evaluation before Hanson would allow Plaintiff to return to work and gave him the name and telephone number of a neuropsychologist.

31. On or about October 6, 2011, Hanson went to Plaintiff's home and placed restrictions on Plaintiff's use of his company vehicle. Prior to the July 2011 car accident, Hanson never placed driving restrictions on Plaintiff and Plaintiff was not, at the time, under any type of driving restrictions by his treating physician or the Iowa Department of Transportation, and even though Hanson had not placed driving restrictions on any other employee with a company vehicles.

32. During Hanson's October 6, 2011 visit to Plaintiff's home, Hanson requested Plaintiff apply for short-term disability benefits.

33. On or about October 12, 2011, Plaintiff was evaluated by an orthopedic surgeon who released Plaintiff to return to work immediately. Despite the release from Plaintiff's orthopedic surgeon, Hanson continued to insist Plaintiff undergo a neuropsychological examination and refused to allow Plaintiff to return to work.

Plaintiff Undergoes a Neuropsychological Examination.

34. On or about October 27, 2011, as instructed by Hanson, Plaintiff underwent an extremely invasive and highly personal neuropsychological evaluation.

35. Plaintiff had a follow-up appointment with a neuropsychologist in November 2011 during which additional neuropsychological evaluation was conducted related to the initial testing done in October.

36. Following the neuropsychological evaluation, Plaintiff repeatedly asked Hanson if he could return to work, having fulfilled all the requirements imposed on him by Hanson.

37. Hanson refused to allow Plaintiff to return to work unless he provided Hanson with a complete copy of Plaintiff's full neuropsychological evaluation report.

38. The doctor who performed Plaintiff's neuropsychological evaluation forwarded a copy of the entire report to Siddall and in approximately mid-January 2012, Siddall reviewed the neuropsychological evaluation report with Plaintiff during an appointment and told Plaintiff that the report did not show any cognitive deficiencies that would prevent him from performing his job.

39. Siddall then issued a work release on January 27, 2012 that included the following:

    (a) The neuropsychological evaluation revealed high-average functioning and no abnormalities;

    (b) Business trips should preferably be kept to less than four days away from home at a time;

    (c) Plaintiff had recovered physically to an adequate point to return to his usual work duties; and

    (d) Plaintiff's neuropsychological evaluation showed no evidence of impairment precluding his return to work.

40. After receiving a copy of Siddall's January 27, 2012 letter, Hanson contacted Siddall and attempted to have a conversation with her about Plaintiff's mental health. Hanson also asked for a copy of the complete neuropsychological report.

41. On or about February 1, 2012, Plaintiff went to the office to discuss returning to work. That day, Hanson would not permit Plaintiff to return to work, and Hanson again insisted that Plaintiff provide Hanson with a copy of Plaintiff's complete neuropsychological report.

42. During the February 1, 2012 meeting, Plaintiff asked Hanson if he would be fired if he refused to provide Hanson with a medical waiver allowing Hanson to obtain a copy of Plaintiff's complete neuropsychological report, and whether it was even legal for Hanson to demand a copy of the complete report. Hanson responded that, with regard to whether Plaintiff would be fired if he did not sign a waiver, he would have to "think about it."

43. On February 2, 2012, Siddall responded in writing to Hanson's attempts to communicate with her regarding Plaintiff's neuropsychological evaluation. Siddall's February 2, 2013 letter to Hanson included the following statements:

   (a) She spoke to the doctor who performed Plaintiff's neuropsychological evaluation, and that doctor would not provide even a summary of the report to Hanson.

   (b) That neuropsychological tests are very detailed and complicated and the reports are not suitable to submit to laypersons or employers;

8

  (c) In her fifteen plus years of working in the field, she had never provided such medical documents to any employer.

  (d) Plaintiff was returned to work without restrictions.

  (e) She did not know what other information she could provide Hanson.

44. On or about February 5, 2012, Hanson called Plaintiff on the telephone and demanded he report to work the next day. Hanson, however, still would not tell Plaintiff whether he would be allowed to work.

45. On or about February 6, 2012, Hanson finally allowed Plaintiff to report to work even though Hanson said he still did not get what he wanted.

46. When Plaintiff returned to work, Hanson reserved the right to force Plaintiff to undergo further testing and evaluation, with complete results to be provided to Hanson; stripped Plaintiff of all earned vacation time, and remarked that he was very disappointed Plaintiff was "acting like this."

47. From February 6, 2012 through August 23, 2012, Plaintiff satisfactorily performed the essential functions of his job and did nothing that warranted the termination of his employment.

<u>Michael Quick's Termination and Subsequent Lawsuit</u>

48. On December 12, 2011, Defendants fired a Hanson Directory Employee, Michael Quick.

49. Quick filed a lawsuit on March 12, 2012, alleging, among other things, that Hanson Directory wrongfully terminated his employment in violation of the public policy of the state of Iowa.

50. In March or April 2012, Hanson Directory's attorney for the Quick lawsuit, Eric Fisk, interviewed Plaintiff, indicating that Fisk was there to talk to Plaintiff about Quick's dismissal.

51. Fisk asked Plaintiff whether Hanson ever threatened Plaintiff, or whether he ever felt threatened by Hanson. Plaintiff responded that while Plaintiff had never felt physically threatened by Hanson, employees never felt like their job was safe and that Hanson told managers that their employees should fear management.

52. Plaintiff then shared his knowledge regarding the circumstances leading up to Quick's termination, including but not limited to, each of the following:

(a) Hanson was angry about remarks of a sexual nature a Hanson Directory employee made about Hanson and that Hanson told Quick that Hanson understood how somebody could shoot somebody else.

(b) Quick was fearful of Hanson, distressed about Hanson's comments regarding shooting someone, and that Quick did not know how to handle Hanson's comments and anger;

(c) Hanson told Quick that Quick should call the police regarding Hanson's comments and Quick's fear of Hanson;

(d) Hanson demanded an apology from Quick; and

(e) That he did not believe Quick should have been fired.

53. When the meeting between Plaintiff and Fisk was concluding, Plaintiff said something like, "I wish that wasn't my testimony, but if I am going to be under oath, that's what I'd say, and I think it's in the best interests of the company to know that."

54. Shortly after Plaintiff's meeting with Fisk, Hanson met with Plaintiff. Hanson said he had heard some "disturbing news" that Plaintiff had been badmouthing Hanson to people.

55. When Plaintiff asked for details, Hanson said "we're not going to play that game," and he refused to provide specifics about Plaintiff's alleged badmouthing.

Hanson Fires Plaintiff

56. At the end of July 2012, Hanson gave Plaintiff a poor performance evaluation, took away Plaintiff's company car, and refused to give Plaintiff a pay raise. The poor performance evaluation, removal of company car, and pay freeze were all unwarranted.

57. In early August 2012, Plaintiff provided Hanson with a note from Siddall requesting Plaintiff be given a few days off for stress-related leave. Hanson agreed to allow Plaintiff to take two days off unpaid.

58. On or about August 6, 2012, Hanson gave Plaintiff a written warning, accusing him of lying about his stress so that he could take a vacation.

59. The written warning Plaintiff received on August 6, 2012 was the first formal discipline Plaintiff received during his employment with Hanson Directory; it was also unwarranted.

60. On or about August 10, 2012, Hanson gave Plaintiff a second written warning for allegedly being unprofessional, disrespectful, irrational, and illogical.

61. The August 10, 2012 write-up came after Plaintiff took time off on a Friday afternoon having already worked forty hours that week, a common practice among Hanson Directory employees which some referred to as "flex time." Hanson also docked Plaintiff's pay for the four hours he took off.

62. On or about August 17, 2012, Plaintiff told Hanson that Plaintiff did not think it was legal for Hanson Directories to dock his pay for four hours, and that Plaintiff felt like he was being discriminated against and being "singled out."

63. Hanson fired Plaintiff on August 23, 2012.

**CAUSES OF ACTION**

**COUNT I**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT as amended by the AMERICAN WITH DISABILITIES ACT AMENDMENTS ("ADAAA"), 42 U.S.C. §12101 *et seq*. – HANSON DIRECTORY SERVICE, INC.**

64. Plaintiff incorporates paragraphs 1 through 63 of this Complaint as if fully set forth herein.

65. Although not actually disabled when his employment ended, Plaintiff qualifies for protection under the ADA, as amended by the ADAAA, because Plaintiff has a history or record of having a disability, or because Plaintiff was wrongfully regarded by Defendants as having a disability, or both.

66. At all material times hereto, Plaintiff was qualified for the position of Vice President of Sales and satisfactorily performed the essential functions of that position at all times material to this case.

67. Plaintiff's history or record of having a disability, or being regarded as having a disability, or both, was a motivating factor in the Defendants' conduct, including but not limited to, disciplining Plaintiff, freezing his pay, and firing terminating Plaintiff's employment.

68. Defendants' conduct was willful or was undertaken with disregard for Plaintiff's federally protected rights.

69. As a proximate result of the Defendants' actions, as set forth above, Plaintiff has suffered and will, in the future, suffer emotional distress, mental anguish, pain and suffering, inconvenience, humiliation, loss of the enjoyment of life, medical expenses, and the loss of wages and benefits

70. Plaintiff requests relief as set forth below.

<u>**COUNT II**</u>
<u>**VIOLATION OF THE IOWA CIVIL RIGHTS ACT**</u>
<u>**IOWA CODE CHAPTER 216 – DISABILITY DISCRIMINATION – HANSON DIRECTORY SERVICE, INC. AND WILLIAM HANSON**</u>

71. Plaintiff incorporates paragraphs 1 through 70 of this Complaint as if fully set forth herein.

72. Although not actually disabled when his employment ended, Plaintiff qualifies for protection under the Iowa Civil Rights Act, because Plaintiff has a history or

record of having a disability, or because Plaintiff was wrongfully regarded by Defendants as having a disability, or both.

73. At all material times hereto, Plaintiff was qualified for the position of Vice President of Sales and satisfactorily performed the essential functions of that position at all times material to this case.

74. Plaintiff's history or record of having a disability, or being regarded as having a disability, or both, was a motivating factor in the Defendants' conduct, including but not limited to, disciplining Plaintiff, freezing his pay, and firing terminating Plaintiff's employment.

75. As a proximate result of the Defendants' actions, as set forth above, Plaintiff has suffered and will, in the future, suffer emotional distress, mental anguish, pain and suffering, inconvenience, humiliation, loss of the enjoyment of life, medical expenses, and the loss of wages and benefits

76. Plaintiff requests relief as set forth below.

## COUNT III
## WRONGFUL TERMINATION IN VIOLATION OF THE PUBLIC POLICY OF THE STATE OF IOWA – HANSON DIRECTORY SERVICE, INC. AND WILLIAM HANSON

77. Plaintiff incorporates paragraphs 1 through 76 above as though fully alleged herein.

78.     Plaintiff engaged in conduct protected by the public policy of this state by expressing his intent to give truthful testimony in the Quick lawsuit that would be adverse to Hanson Directories interests in that case.

79.     Plaintiff's expressed intent to testify truthfully in Quick lawsuit and to provide testimony that was adverse to Hanson Directory's interests was a determining factor in the decision to fire Plaintiff.

80.     As a proximate result of Hanson Directory's conduct, Plaintiff has suffered lost wages and benefits and emotional distress and requests damages as set forth in more detail below.

81.     Because Defendants' conduct was willful and wanton, Plaintiff is entitled to punitive damages.

### RELIEF

**WHEREFORE,** Plaintiff requests judgment be entered in his favor and against Defendants and the Court order the following:

**COUNT I – VIOLATION OF THE ADAAA – HANSON DIRECTORY SERVICE, INC.**

A.  Enter a judgment against Defendant Hanson Directory Service, Inc. for violating Plaintiff's rights under the ADAAA.

B.  Grant equitable relief to ensure that Defendant Hanson Directory Service, Inc. will not in the future engage in any employment practice which discriminates on the basis of disability and violates the ADAAA.

C.  Make Plaintiff whole by:

        1.      Providing him appropriate lost earnings and benefits with interest;

        2.      Reinstating him or awarding him front pay in lieu of reinstatement;

        3.      Providing compensation for pecuniary losses including, but not limited to, costs to be incurred for health and life insurance premiums and costs associated with seeking new employment;

        4.      Providing compensation for non-pecuniary losses, including without limitation, emotional distress, mental anguish, pain and suffering, inconvenience, humiliation and the loss of the enjoyment of life; and

        5.      Awarding other equitable relief as deemed appropriate by the Court.

D.     Award Plaintiff punitive damages against Defendant Hanson Directory Service, Inc. in an amount sufficient to punish Defendant for acting with malice or reckless indifference in violating the Plaintiff's protected rights under the ADAAA and to deter Defendant and others from engaging in illegal conduct.

E.     Award Plaintiff a judgment for his reasonable attorney fees and costs pursuant to the ADAAA.

F.     Award pre-judgment interest, against Defendant Hanson Directory Service, Inc., as allowed by law.

G.     Grant such further relief as the Court deems necessary and proper.

**COUNT II – VIOLATION OF THE IOWA CIVIL RIGHTS ACT – HANSON DIRECTORY SERVICE, INC. AND WILLIAM HANSON**

A.     Enter a judgment jointly and severally against Defendants Hanson Directory Service, Inc. and William Hanson for violating Plaintiff's rights under the Iowa Civil Rights Act.

B.  Grant equitable relief to ensure that Defendants Hanson Directory Service, Inc. and William Hanson will not in the future engage in any employment practice which discriminates on the basis of disability and violates the Iowa Civil Rights Act.

C.  Make Plaintiff whole by:

   1.  Providing him appropriate lost earnings and benefits with interest;

   2.  Reinstating him or awarding him front pay in lieu of reinstatement;

   3.  Providing compensation for pecuniary losses including, but not limited to, costs to be incurred for health and life insurance premiums and costs associated with seeking new employment;

   4.  Providing compensation for non-pecuniary losses, including without limitation, emotional distress, mental anguish, pain and suffering, inconvenience, humiliation and the loss of the enjoyment of life; and

   5.  Awarding other equitable relief as deemed appropriate by the Court.

D.  Award Plaintiff a judgment, jointly and severally against Defendants Hanson Directory Service, Inc. and William Hanson, for his reasonable attorney fees and costs pursuant to the Iowa Civil Rights Act.

E.  Award pre-judgment interest, jointly and severally against Defendants Hanson Directory Service, Inc. and William Hanson., as allowed by law.

F.  Grant such further relief as the Court deems necessary and proper.

**COUNT III – WRONGFUL TERMINATION – HANSON DIRECTORY SERVICE, INC. AND WILLIAM HANSON**

A.  Enter a judgment jointly and severally against Defendants Hanson Directory Service, Inc. and William Hanson declaring Defendants' conduct complained

about herein to be in violation of Plaintiff's rights as secured by the public policy of the State of Iowa.

B. Enjoin Defendants Hanson Directory Service, Inc. and William Hanson from engaging in any conduct violating Plaintiff's rights or the rights of others similarly situated as secured by the public policy of the State of Iowa, and for such injunctive and other relief as will prevent Defendants from continuing their discriminatory practices.

C. Make Plaintiff whole by:

   1. Providing him appropriate lost earnings and benefits with interest;

   2. Reinstating him or awarding him front pay in lieu of reinstatement;

   3. Providing compensation for pecuniary losses including, but not limited to, costs to be incurred for health and life insurance premiums and costs associated with seeking new employment;

   4. Providing compensation for non-pecuniary losses, including without limitation, emotional distress, mental anguish, pain and suffering, inconvenience, humiliation and the loss of the enjoyment of life; and

   5. Awarding other equitable relief as deemed appropriate by the Court.

D. Award Plaintiff punitive damages against Defendants Hanson Directory Service, Inc. and William Hanson in an amount sufficient to punish Defendants for acting with malice or reckless indifference in violating the Plaintiff's protected rights and to deter Defendants and others from engaging in illegal conduct.

E. Award pre-judgment interest, jointly and severally against Defendants Hanson Directory Service, Inc. and William Hanson., as allowed by law.

F. Award such other additional and further relief as the Court deems proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury of all issues herein.

Respectfully submitted,

*Thomas W. Foley*
Thomas W. Foley          AT0002589
Katie Ervin Carlson       AT0008958
Babich Goldman, P.C.
501 SW 7th Street, Suite J
Des Moines, Iowa  50309
Telephone:  (515) 244-4300
Facsimile:  (515) 244-2650
E-Mail:  TFoley@babichgoldman.com
E-Mail:  Kcarlson@babichgoldman.com

ATTORNEYS FOR PLAINTIFF

Original Filed.